E-FILED
Tuesday, 20 August, 2024  11:40:24 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF ILLINOIS

### URBANA DIVISION

| | |
|---|---|
| ALYSON STEPHENSON,     ) | **JURY DEMAND** |
|     ) | |
|     Plaintiff,     ) | Case No. 23-CV-02081 |
|     ) | |
|     v.     ) | |
|     ) | |
| CHAMPAIGN COMMUNITY SCHOOL     ) | |
| DISTRICT NO. 4,     ) | |
|     ) | |
|     Defendant.     ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO
### THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT

NOW COMES the Plaintiff, ALYSON STEPHENSON, ("Stephenson") by her attorneys Costigan & Wollrab, P. C. and for her Response in Opposition to the Motion for Summary Judgment filed by Defendant, CHAMPAIGN COMMUNITY SCHOOL DISTRICT NO. 4, ("the District") filed pursuant to F.R.C.P.56 and Local Rule 7.1 (D) hereby states the following:

## I.    INTRODUCTION

Stephenson worked as a fifth-grade school teacher for the District from August of 2015 until she left the employ of the District in July of 2020. In the fall of 2019 and continuing to the end of the school year in 2020, Stephenson experienced discrimination, a hostile work environment and retaliation due to her race and gender because of actions committed by her immediate supervisor, Renayee Westfield, Assistant Principal of Bottenfield Elementary School ("Bottenfield"), and Jason Pope, the Principal of Bottenfield. Stephenson is a Caucasian female. The District's Assistant Principal, Renayee Westfield is a black female; and the District's Principal, Jason Pope is a Caucasian male.

1

Stephenson filed this cause against the District alleging an action for violations of Title VII of the Civil Rights Act of 1990 for discrimination, hostile work environment and retaliation. Stephenson asserts that there are genuine issues of material fact which preclude the granting of the District's motion for summary judgment; and Stephenson asserts that the evidence for consideration by this court on the District's motion for summary judgment considered in the light most favorable to Stephenson would permit a reasonable factfinder to conclude that Stephenson's race and gender led to a hostile work environment at Bottenfield; and led to discrimination and retaliation resulting in Stephenson sustaining adverse employment actions by her supervisors.

## II.  <u>RESPONSE TO DEFENDANT'S UNDISPUTED ASSERTED MATERIAL FACTS</u>

(1)  <u>**Undisputed Material Facts**</u>

The following paragraphs in the District's Statement of Undisputed Material Facts contain undisputed material facts: 1, 2, 3, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 19, 21, 22, 25, 26, 27, 28, 29, 30 and 31.

(2)  <u>**Disputed Material Facts**</u>

The following paragraphs in the District's Statement of Undisputed Material Facts are disputed material facts:

4.      Stephenson generally got along with her colleagues at work and there was no one that she did not get along with.  Ex. A, 22:16-23:4.

This statement is disputed. Stephenson testified that she had a great relationship with Renayee Westfield for four of the five or six years that they worked together; and that she had a professional relationship with Jason Pope. Ex. A, 22:19-22. Stephenson said that she generally

got along with her "other" colleagues after she described her relationship with Renayee Westfield and Jason Pope. Ex. A, 22:23-23:1.

9.      In June 2019, Stephenson flew to Dallas, Texas for a work conference.  Ex. A, 31:13-32:6.  While at the Champaign airport, two or three black female administrators, including Westfield, assisted Stephenson with her bags and were kind and friendly.  Ex. A, 31:13-32:6. When they arrived at the Dallas Airport, they told Stephenson that they had coordinated their own ride to the hotel and they would see her there.  Ex. A, 31:13-32:6, 34:13-36:8.  As a result, Stephenson had to find her own ride to the hotel with her six-week-old child whom she chose to bring on the trip with her as well as her mother-in-law.  Ex. A, 31:13-32:6, 34:13-36:8.

The statement in paragraph 9 regarding Stephenson's travel to Dallas, Texas from Champaign is true. The statement that two or three black female administrators, including Renayee Westfield, assisted Stephenson at the airport in Champaign is true. The statement that the black female administrators coordinated their own ride to the hotel and told Stephenson she would have to find her own ride to the hotel is true. Stephenson disputes the statement that she was traveling with her mother-in-law when she was left at the airport to find her own ride to the hotel. Ex. A, 31:13-18.

18.     On February 27, 2020, during a committee meeting to discuss behavioral interventions for three students, Westfield read out loud from an article relating to a picture depicting equality verses equity.  Compl. ¶ 10j; Ex. A, 43:19-45:16, 71:21-73:18.  Stephenson asserts that the article indicated the picture was an example of white supremacy.  Ex. A, 43:19-45:16.  Prior to this meeting occurring, Stephenson had posted that same picture in an email she sent to Westfield.  Ex. A, 44:23-45:6.  Westfield never stated that Stephenson, or anyone, was a white supremacist.  Ex. A, 73:17-18.

The statement that on February 27, 2020, during a committee meeting to discuss behavioral interventions for three students, Westfield read out loud from an article relating to a picture depicting equality versus equity is true. The statement that Stephenson asserts that the article indicated the picture was an example of white supremacy is disputed. Ex. A, 45:7-11. The statement that Stephenson had posted that same picture in an e-mail she sent to Westfield is true. The statement that Westfield never stated that Stephenson, or anyone, was a white supremacist is true.

20.    Prior to this March 10, 2020, student issue happening, Stephenson had requested that Pope require another adult be present when Westfield would have one-on-one conversations with students in her classroom.  Ex. A, 47:4-48:9, 53:7-11.  Stephenson indicates that this request was misinterpreted by Westfield to mean that she should not go to Stephenson's classroom unless another adult was present, which is why Westfield did not personally respond to Stephenson's call for assistance and sent the school nurse instead.  Ex. A, 47:4-48:9.

The statement that prior to this March 10, 2020, student issue happening, Stephenson had requested that Pope require another adult to be present when Westfield would have one-on-one conversations with students in Stephenson's classroom is disputed. Ex. A, 47:17-24-48:1-9. The statement that Stephenson indicates that this request was misinterpreted by Westfield to mean that she should not go to Stephenson's classroom unless another adult was present is true. The statement that this was why Westfield did not personally respond to Stephenson's call for assistance and sent the school nurse instead is disputed. Plf. Ex. 1, 45:6-25.

(3)    **Disputed Immaterial Facts**

23.    Stephenson never submitted a complaint to Human Resources regarding any alleged discrimination, harassment or retaliation.  Ex. A, 81:2-7.

4

This fact is disputed by Stephenson; and is asserted to be immaterial. Stephenson made a complaint to Jason Pope the principal. Stephenson did not know whether Jason Pope turned the complaint in to Human Resources. Ex. A, 81:2-11.

      (4)    **Undisputed Immaterial Facts**

24.    Stephenson never filed a grievance.  Ex. A, 24:10-14, 81:12-16.

The applicable law does not require Stephenson to file a grievance as a condition precedent to filing suit; and the filing of a union grievance is not an element of Stephenson's prima facie case in an action for discrimination, hostile environment or retaliation under Title VII. Stephenson met her obligation to exhaust her administrative remedies as a condition precedent to filing suit by filing a Charge of Discrimination with the Equal Employment Opportunity Commission. Ex. A, 28:16-24-29:1-5.

      (5)    **Additional Material Facts**

Stephenson asserts that the following Additional Material Facts are relevant to the consideration of the issued raised in opposition to the Motion for Summary Judgment filed by the District.

1.    Stephenson had a great relationship with Renayee Westfield for four of the five to six years that Stephenson worked at Bottenfield. Ex. A, 22:1-5.

2.    Stephenson reported that Westfield made comments about the KKK, stating that she (Westfield) would not be surprised if those in attendance at the all-staff meeting, including Stephenson, had just walked out of a KKK meeting; but it's none of her business what we do in our free time. Ex. A, 25:17-21.

3.    Stephenson reported that Westfield called Megan Herrig, the first-grade teacher, and asked her to consider moving to fifth grade as a favor to her. Ex. A, 25:22-26:2.

4.      Stephenson had paid to have her mother-in-law fly down later to care for her infant daughter. Ex. A, 31:15-17.

5.      Stephenson reported that she was treated differently from her counterpart Caucasian male teacher, Andy McDaniel, because Westfield had said that he was "white but not too white". Ex. A, 26:3-7, 32:7-9, 39:3-24.

6.      Stephenson went to the union building representatives in the fall of 2019. Ex. A, 26:8-15. In March of 2020, a group of 20 to 25 teachers from Bottenfield went to a meeting with the Union representatives in support of Stephenson; and to discuss the general environment of the building. Ex. A, 26:14-21.

7.      The general tone of the building and the administrators at Bottenfield was that white female teachers could not handle difficult students. Ex A, 33:9-11.

8.      Stephenson's male counterparts, Andy McDaniel and Nick Ponder, who were both Caucasian male teachers, were treated better than Stephenson by Westfield because Westfield stated that Andy McDaniel and Nick Ponder are the only ones who know how to handle our difficult students. Ex. A, 33:17-23.

9.      Stephenson felt that the environment at Bottenfield made people feel like being white was a problem. Ex. A, 40:3-9.

10.     Reneyee Westfield took the attention away from a meeting about behavior issues with three students and the Check-In/Check-out program to stand up and read an article to Stephenson about how a picture of three students who were standing on different sized boxes to try and look over a fence was an example of white supremacy. Renayee Westfield read the entire article word for word aloud to Stephenson, directing it toward Stephenson. Ex. A, 44:23-45:12.

11.     Several people came up to Stephenson after the meeting where Renayee Westfield read the article to Stephenson and said to Stephenson how uncomfortable it was and inappropriate and they apologized that it had happened to Stephenson. Ex. A, 45:13-16.

12.     Stephenson was the only white female teacher traveling from Champaign to Dallas for the AVID conference with the other black female administrators; and she was clearly left behind by the other black female administrators who made transportation arrangements to the hotel from the airport, which was a forty-minute drive. Ex. A, 35:1-5, 36:2-5. The other teachers and an instructional coach from Bottenfield who were also attending the meeting flew from Bloomington to Dallas and arrived before Stephenson's flight arrived from Champaign to Dallas. Ex. A, 35:8-23. Stephenson did not arrange the travel. Ex. A, 35:10-11.

13.     Stephenson had a meeting with Jason Pope and Renayee Westfield regarding a student behavior issue. After the meeting, Westfield pulled Stephenson into her office for a one-on-one discussion and said "I just want you to know I think I know who is sending those e-mails." Ex. A, 41:1-24. Prior to this meeting, Stephenson and two other teachers had received anonymous e-mails from someone posing as a student. Ex. A, 41:6-15. Renayee Westfield told Stephenson that Westfield thought she knew who was sending the e-mails; and Westfield said "It's a staff member, and you need to distance yourself."  She also said "You need to watch who you're associating with." Ex. A,41:20-24-42:1. Westfield would not tell Stephenson who it was or how she knew. Ex. A, 42:1-7.

14.     Stephenson felt harassed by Westfield because Westfield was telling her she knew something and then telling her to watch who she associated with; and Stephenson was not sure if that was meant to not associate with males or females or what. Ex. A, 42:10-22-43:11-14.

7

15.     Stephenson went to Jason Pope and told him that it's a very uncomfortable and hostile work environment to be in and she wanted a meeting. Ex. A, 47:5-7. Stephenson's teaching partner, Kerri Schmidt went with Stephenson to a meeting with Jason Pope and Orlando Thomas. Ex. A, 47:10-12. At that meeting, Kerri and Stephenson were attempting to address their complaints about hostile work environment and Jason Pope said they were not going to discuss those concerns; but would only discuss a strategy for moving forward. Ex. A, 47:12-16.

16.     One issue discussed at the meeting with Jason Pope and Orlando Thomas was Westfield had pulled a student out of Stephenson's classroom. Westfield was having lunch with them and going on walks with them; and at one point Westfield asked one of Stephenson's students if she was uncomfortable being a black student in Stephenson's classroom. Ex. A, 47:17-24-48:1. As a result of Westfield pulling Stephenson's students out to talk to them, Stephenson told Jason Pope that if Westfield was going to pull a student out to talk to them, Stephenson wanted another adult present because of the nature of the conversation Westfield was having with students. Ex. A, 48:2-9.

17.     Stephenson and Kerri Schmidt also had a meeting with just Jason Pope. Stephenson told Jason Pope that Bottenfield was a very uncomfortable place to work and that we needed to find a solution because it was not sustainable. Ex. A, 50:11-22.

18.     Jason Pope was aware of the things that had happened previously with the airport, the KKK comment made at the staff meeting to the white supremacy article being read out at Stephenson; and Westfield refusing to help in Stephenson's classroom. Ex. A, 51:1-8. Stephenson told Jason Pope that the environment was toxic and unbearable. Ex. A, 51:7-8.

Ann Ramirez, a union representative was also at the meeting and she was taking notes. Ex. A, 52:8-10. Stephenson received a copy of the notes of the meeting shortly after the meeting. Ex. A, 52:14-19.

19.    Kerri, Jason Pope and Ann Ramirez were having a meeting and then Stephenson joined a short time later. Ex. A, 53:3-6. The notes of the March 6, 2020 meeting taken by Ann Ramirez, referenced as Dep. Ex. #9, accurately reflect what happened at the meeting. Ex. A, 53:12-17, Plf.Ex.4, which is a copy of the notes taken at the March 6, 2020 meeting.

20.    The meeting with Kerri, Stephenson, Jason Pope and Orlando Thomas occurred a after the March 6, 2020 meeting. Ex. A, 53:24-54:1-5. At that meeting, Jason Pope did most of the talking and just said he knows that Kerri and Stephenson have expressed concerns about the environment and how they had been treated and some of the specific incidents; but that he was just going to discuss ways to move forward. Ex. A, 54:15-22. Notes were taken at the meeting by one of the union representatives and Stephenson received a copy of the notes shortly after the meeting. Ex. A, 55:10-24-56:1-5. Stephenson stated that Dep. Ex. 10 accurately reflected what was discussed at the meeting. Ex. A, 56:12-17, Plf. Ex.5, which is a copy of the notes of the March 10, 2020 meeting.

21.    Stephenson felt that it was totally inappropriate for Westfield to have said that someone, particularly a white person, is part of the KKK or make that assumption especially in a public-school building. Ex. A, 59:22-24-60:1.

22.    In January of 2020, Jason Pope did not introduce a new staff person to Stephenson. Jason Pope skipped over Stephenson twice while making introductions to other staff near Stephenson; but did not introduce the new staff person to Stephenson. Ex. A, 60:17-24-61:1-14.

23.     Towards the end of the school year in probably May of 2020, Stephenson received a call from a first-grade teacher, Megan Herrig, who said that she had received a call from Renayee Westfield asking Megan to take Stephenson's spot as a fifth-grade teacher as a favor to Renayee Westfield.  Ex. A, 64:7-13 65:23-24-66:1-4. Jason Pope sent an e-mail to Stephenson suggesting that it was Megan who wanted to move to fifth grade and asking Stephenson to consider moving to first-grade. Ex. A, 64:14-19.

24.     After the decision was communicated to the first-grade team, including Megan, that they would be teaching first grade; Jason Pope continued to pursue Stephenson about the first-grade position and why she did not want to move to first grade; and Jason's actions made Stephenson feel uncomfortable like he was setting her up to fail. Ex. A, 65:14-20. Stephenson felt that the request for her to move to first-grade was with ill intentions; and the fact that Renayee had asked Megan to take Stephenson's spot as a favor to Renayee made Stephenson feel it was not in Stephenson's or the students' best interest. Ex. A, 68:1-6, 69:3-13.

25.     Stephenson resigned from her position as a teacher with the District because of all of the incidents that happened to me and the environment that I was in and the uncertainty and the unknown and the completely unprofessional and unacceptable environment that anyone shouldn't ever have to endure. Ex. A, 70:3-8, 82:16-18.

26.     Stephenson felt that Jason Pope and Renayee Westfield subjected Stephenson to a hostile and harassing environment. Stephenson stated that it was the repetitive nature and the persistence that made it so terrible; and the fact that in many instances it was targeted at her. Ex. A, 74:11-18, 75:2-8.

27:     Stephenson felt that Jason Pope and Renayee Westfield were retaliating against her when they tried to get Megan to take Stephenson's spot in fifth grade. Ex. A, 76:23-24=77:1-

5. Stephenson felt that they were retaliating against her because she had gone to administration several times; and that she had gone to the union and had a lot of staff support. Ex. A, 77:8-19.

28.     Stephenson did submit a complaint of harassment and discrimination and retaliation to Jason Pope. Ex. A, 81:2-6.

29.     During the time that Renayee Westfield served as the assistant principal under Jason Pope, Westfield was Stephenson's supervisor and evaluator. Westfield would conduct both formal and informal observations of Stephenson during the school year. Plf. Ex. 1, which is the Dep. Transcript of Renayee Westfield (hereafter referred to as "Plf. Ex. 1"). Plf. Ex. 1, 8:5-13.

30.     During a staff meeting where all staff members at Bottenfield were present, Westfield made a reference to the Ku Klux Klan. Jason Pope was also in attendance at this meeting. Plf. Ex.1, 20:22-25, 21:11-25-22:1.

31.     Westfield read excerpts from three articles during the Tier 2 committee meeting attended by Stephenson. Westfield read from an article titled "Sippin the EquiTEA". Plf. Ex.1, 35:15-13, 36:8-10, 68:6-20. Westfield did state that the "Sippin the EquiTEA" article did reference white supremacy. Plf. Ex. 1, 71:15-18. Plf. Ex.3, which is a copy of the article titled "Sippin the EquiTEA".

32.     At a meeting on November 4, 2019, a statement was made by Renayee Westfield that our teaching evaluation model is "white streamed". Def. Ex. B, which are the sworn Interrogatory Responses of Stephenson, pg.9.

33.     At the end of a committee meeting on November 11, 2019, Renayye Westfield said directly to Stephenson "I'm going to tell you one more thing. With all of this union stuff going on do with it what you want, but I suggest you start separating yourself from your teammates." Ex. B, pg.9.

34.     Renayee Westfield had talked to three of Stephenson's students. And in that meeting those three students mentioned that they felt that Stephenson was racist. Westfield said in Stephenson's defense they also said that about the other two fifth grade teachers. Plf. Ex.1, 53:12-25, 56:13-17. As soon as the students mentioned that, Westfield called Jason Pope into the meeting. Westfield stated it was that meeting that made Stephenson feel that Westfield was talking with Stephenson's students about her (Stephenson) being a racist. Plf. Ex. 1, 54:1-8.

35.     Westfield stated that she was the only black certified staff person at Bottenfield, and conversations on race were hard to have as an administrator and as equity AP for the District. Plf. Ex. 1, 57:20-23, 58:1-4.

36.     Westfield knew prior to leaving the Dallas airport in her van that Stephenson's mother-in-law had not shown up. Plf. Ex.1, 86:13-20.

37.     Jason Pope asked Renayee Westfield to have a conversation with the first-grade teacher that did not get the third-grade position to move to fifth grade. Plf. Ex. 1, 157:11-18. Westfield asked Megan Herrig if she would be comfortable moving to fifth grade. Plf. Ex. 1, 158:1-9. Westfield stated that it was Jason Pope's intention to move Stephenson from fifth grade to first grade. Plf. Ex. 1, 158:14-25-159:1.

38.     Stephenson told Jason Pope that she wanted another adult present when her students were talked to or were having lunch with an adult due to Stephenson's lack of trust with the administration. Plf. Ex. 6, which is the Deposition of Jason Pope, 68:7-14.

39.     Jason Pope had a coaching conversation with Renayee Westfield following the meeting where Westfield made the KKK comment. Plf. Ex. 6, 102:15-24-103:1-3.

40.    The District General Personnel Nondiscrimination policy provides in pertinent part the following:

> It shall be the policy of the Board of Education of this District to prohibit Discrimination against any employee on account of race, color, creed, religion, national, ancestry, sex, age, marital status, physical or mental handicap unrelated To ability, or unfavorable discharge from the military. Plf. Ex. 2, pg. 1, which is a copy of the District General Personnel -Nondiscrimination policy produced by the District in its Initial Disclosures bate-stamped CCSD 4 000050.

41.    The District General Personnel Nondiscrimination policy further provides the following:

> Any employee who believes he/she has been discriminated against by any supervisor, co-worker, or non-employee should immediately notify his/her supervisor, or if the supervisor is alleged to have discriminated, the next immediate supervisor may be notified. Plf. Ex. 2, pg.1, which is a copy of the District General Personnel -Nondiscrimination policy produced by the District in its Initial Disclosures bate-stamped CCSD 4 000050.

42.    The District General Personnel -Workplace Harassment Prohibited policy provides:

> <u>Whom to Contact with a Report or Complaint</u>
>
> An employee should report claims of harassment to any of the following: his/her immediate supervisor, the Building Principal, an administrator, or the Executive Director of Human Resources…. Plf. Ex. 2, pg.3, which is a copy of the District General Personnel – Workplace Harassment Prohibited policy produced by the District in its Initial Disclosures bate-stamped CCSD 4 000063.

43.    Jason Pope did not recall initiating an investigation regarding complaints by Ms. Schmitt or Stephenson with regard to claims of hostile work environment. Plf. Ex. 6, 66:1-11.

44.    Stephenson, Kerri Schmitt, Ann Ramirez and Jason Pope attended a meeting on March 6, 2020. The meeting notes taken by Ann Ramirez accurately reflect what was discussed during that meeting with respect to the notes recorded at and after Stephenson's arrival at the meeting. Plf. Ex. 4, which is a copy of Dep. Ex. 9 in Ex. A, 52:3-16, 52:23-24-53:1-6.

III.     **LEGAL STANDARD**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324. In other words, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Nevertheless, this court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

The court has one task and one task only; to decide, based on the evidence of record, whether there is any material dispute of fact that requires trial. The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.,* 622 F. 3d 745, 752 (7th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). In reaching this determination, the court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v. City of Ft. Atkinson,* 84 F.3d 960, 961 (7th Cir. 1996). At the summary judgment stage, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," such matters must be left for the jury. *Washington v. Haupert,* 481 F. 3d 543, 550 (7th Cir. 2007). Accordingly, the summary judgment standard is applied "with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Bellaver v. Quanex Corp.,* 200 F. 3d 485, 491 (7th Cir. 2000).

IV.    <u>**ARGUMENT**</u>

A. **Stephenson can meet her burden to establish that there are "fishy" circumstances to state a valid claim for reverse discrimination; and this court should consider all of the circumstances surrounding Stephenson's employment with the District in finding that Stephenson has made a showing of circumstances that warrant a trial on the issues in controversy in this cause.**

Under Title VII, an employer may not discriminate based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). To succeed on a Title VII claim, the plaintiff-employee must prove three elements: [1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the

15

plaintiff's membership in the protected class. *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). The legal standard used to evaluate a discrimination claim "is simply whether the evidence," considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (overruling "convincing mosaic" as a legal standard and criticizing district courts' applications of direct and indirect frameworks).

The Seventh Circuit in its decision in *Oritz* stated that: "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765. The holding in *Ortiz* applies to employment discrimination claims as well as retaliation claims. *Lewis v. Wilkie*, 909 F.3d 858, 867 n.2 (7th Cir. 2018). Thus, a court must consider the evidence under the holistic approach articulated in *Ortiz*: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." Id. See also *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792 (7th Cir. 2018) (reaffirming Ortiz).

While courts may use the familiar burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," it is "not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

In cases of reverse discrimination where the plaintiff is not part of a protected class, a plaintiff can meet the first prong of the *McDonnell* test by showing "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts at hand." *Gore v. Indiana University*, 416 F. 3d 590, 592 (7th Cir.) The Seventh Circuit in its decision in *Gore* recognized that the conventional *McDonnell Douglas* framework is not very helpful for so-called reverse-discrimination cases. "Because it is the unusual employer who discriminates against majority employees," *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 456–57 (7th Cir.1999), a male plaintiff alleging gender discrimination must show something more than the fact that he is gendered. See, *e.g., Katerinos v. U.S. Dep't of Treasury,* 368 F.3d 733, 736 (7th Cir.2004).

This was what the Seventh Circuit meant in its decision in *Phelan v. City of Chicago,* 347 F.3d 679, 684 (7th Cir.2003), when the Court recognized that in cases of reverse discrimination, "the first prong of the *McDonnell* test cannot be used." *Id.* at 685. Rather, the plaintiff in such cases "must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand." *Id.* at 684.

In the instant case, Stephenson can show that there is something "fishy" about the facts at hand, namely the following:

- Renayee Westfield, the District's Assistant Principal, reading out an article referencing "white supremacy" directly to Stephenson when Stephenson was in a committee meeting addressing student behavior issues with other colleagues. Additional Material Facts ("AMF") AMF ¶10, AMF ¶31;

- Renayee Westfield stating at an all-staff meeting that Stephenson attended that the District's teacher evaluation method was "white-streamed" AMF ¶32;

- Renayee Westfield stating at an all-staff meeting that the white teachers in attendance, including Stephenson, could have just walked out of a KKK meeting; but it was fine with her because what the teachers did on their own time was none of her business Statement of Undisputed Facts ("SUF") SUF ¶15, AMF ¶21, AMF ¶30;

- Renayee Westfield stated at an internal AVID meeting attended by Stephenson that only Nick Ponder and Andrew McDaniel, male Caucasian teachers, can handle difficult students SUF ¶11;

- Renayee Westfield stating that Andrew McDaniel was "white but not too white" SUF ¶12;

- Renayee Westfield telling Stephenson to distance herself from her teammates and to watch whom she associated with SUF ¶13, AMF ¶33;

- Renayee Westfield and two or three other black female administrators leaving Stephenson to make her own transportation arrangements to get from the Dallas airport to the hotel that was about forty minutes away even though Renayee Westfield knew that Stephenson was by herself with her six-week-old infant; and was the only Bottenfield staff member left at the Dallas airport AMF ¶15; and

- Renayee Westfield was having lunch with Stephenson's students; and going on walks with them; and at one-point Renayee Westfield asked one of Stephenson's students if she was uncomfortable being a black student in Stephenson's classroom AMF ¶16.

The above circumstances support a finding that while unusual, in the instant case, the District supervisory personnel did indeed discriminate against Stephenson because she was Caucasian.

As the Seventh Circuit stated explicitly in its decision in *Mills v. Health Care Service Corp.,* 171 F. 3d 450, 456-457 (7th Cir.1999), "this modified test is not to be interpreted in a constricting fashion ... [i]t in no way precludes any plaintiff with direct evidence of discrimination from bringing his claim." *Id.* at 457.

Considering the evidence in the light most favorable to Stephenson, there is sufficient evidence to support a finding by this court of circumstances warranting consideration of Stephenson's reverse discrimination, harassment, retaliation and hostile work environment claims by a factfinder.

**B. Stephenson can establish that her race and gender were factors that led to actionable discrimination, hostile work environment and retaliation by supervisory personnel of the District.**

A hostile work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998), "For workplace conduct to constitute a hostile work environment actionable under Title VII, the harassment 'must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive environment.' "*Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F. 3d 1044, 1048-49 (7th Cir. 2000) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). "In determining whether contested conduct creates an objectively hostile work environment, several factors may be considered including 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' "*Hilt-Dyson*, 282 F. 3d at 463 (quoting *Faragher,* 524 U.S. at 787-88)). Further, "the alleged

discriminatory conduct cannot be considered in a vacuum; rather an employee's claim must be evaluated in light of the social context in which events occurred." *Id.*

Whether complained of conduct rises to the level of severe or pervasive depends on the totality of the circumstances. *Nischan v. Stratosphere Quality, LLC,* No. 16-3463, 2017 WL 3275149. at *5 (7th Cir. Aug. 2, 2017). As the totality of the facts and circumstances outlined in support of Stephenson's argument in favor of a finding of "fishy" circumstances offered in support of her assertion that Stephenson faced reverse discrimination, harassment and retaliation as a consequence of the actions of Renayee Westfield, the Assistant Principal and the failure of Jason Pope, the Principal, to prevent the continued actions of Renayee Westfield, so too does a consideration of those same facts and circumstances support a determination that Stephenson has come forward with sufficient evidence to raise a genuine issue of material fact for consideration by the factfinder that Stephenson was subjected to a hostile work environment.

It was the repetitive nature and the persistence of the conduct by Renayee Westfield that created a hostile work environment for Stephenson. Additionally, the comments, statements, and innuendos of Renayee Westfield were specifically targeted toward Stephenson. In fact, Stephenson said that Renayee Westfield's comments made Stephenson feel it was a problem that she was white. AMF ¶9. It was the actions of Renayee Westfield in her capacity as an Assistant Principal and a supervisor and evaluator of Stephenson that caused Stephenson to suffer distress and hardship resulting from a work environment that Renayee Westfield made hostile to white female teachers, including Stephenson AMF ¶26.

The District argues that Stephenson cannot show that she suffered an adverse employment action; however the caselaw and the appliable provisions of Title VII make it clear that a plaintiff can recover for adverse employment actions or for being subjected to conduct that

exposes the plaintiff to a hostile work environment. Here a consideration of the evidence presented in the light most favorable to Stephenson supports a finding that Stephenson was subjected to a hostile work environment because of the repetitive, discriminatory, hostile and relentless actions of her supervisor, Renayee Westfield. Furthermore, Jason Pope, the Principal chose to ignore Stephenson's requests for assistance in resolving what she repeatedly reported to Jason Pope was a hostile work environment as a white female because of the conduct of Renayee Westfield. Kerri Schmidt echoed those same complaints when she and Stephenson met with Jason Pope on March 6, 2020. AMF ¶15, AMF ¶44.

**C. Stephenson can establish a claim of retaliation against the District following her exercise of her protected right to report conduct that she deemed discriminatory, harassing, and hostile.**

Stephenson followed the District's personnel policy directives when she took her complaints regarding the conduct and actions of Renayee Westfield to Principal, Jason Pope. The District's Personnel Non-discrimination policy provided that if an employee's immediate supervisor was the individual alleged to have discriminated, then the employee was directed to contact the next immediate supervisor. AMF ¶ 41. In the instant case, Stephenson alleges that it was her immediate supervisor, the Assistant Principal, Renayee Westfield, who was discriminating against Stephenson. The next immediate supervisor above Renayee Westfield was Jason Pope, the District's Principal.

Additionally, the District's General Personnel- Workplace Harassment Prohibition policy also provided that claims of harassment could be reported to their immediate supervisor, the Principal of the building, an administrator or the Director of the Human Resources Department. There was no requirement in the District's harassment or discrimination policy that Stephenson report her complaints and concerns to Human Resources as asserted by the District. AMF ¶42.

In accordance with the directives of the District relating to the reporting of discrimination, Stephenson went to Jason Pope and reported Renayee Westfield's discriminatory actions toward Stephenson. SUF ¶21, SUF ¶22, AMF ¶15, AMF ¶44. In fact, in the meeting that Stephenson attended with Jason Pope and her teaching partner, Kerri Schmidt and the union representative, Ann Ramirez, Stephenson and Schmidt both related that the environment at Bottenfield was hostile; and Stephenson had made Jason Pope aware of the specific conduct committed by Renayee Westfield in her prior communications with Jason Pope. AMF ¶44. Jason Pope in the meeting he conducted with Stephenson and Orlando Thomas also admitted that Stephenson had advised him previously of incidents with Renayee Westfield that Stephenson believed were discriminatory and harassing. SUR ¶21 and SUR ¶22.

Here, Stephenson participated in the protected activity of reporting the conduct of Renayee Westfield. It was then on Jason Pope to initiate an investigation; and Jason Pope admitted that he did not initiate an investigation after Stephenson made her reports to him on March 6, 2020 and March 10, 2020.

In close proximity to Stephenson's participation in a protected activity occurred; Jason Pope approached Renayee Westfield and asked her to talk with Megan Herrig, a first-grade teacher to ask Megan Herrig to move from first-grade and take Stephenson's fifth grade position. Renayee Westfield testified that it was Jason Pope's plan to place Megan Herrig in Stephenson's position; and it was only because Megan Herrig declined the request of Renayee Westfield to move to first-grade that Stephenson was allowed to remain on the fifth-grade team for the coming school year.

Despite the fact that Megan Herrig was unwilling to move to the fifth grade position, Jason Pope continued to pursue discussions with Stephenson as to why she did not want to move

to first grade; and Jason Pope's communications to Stephenson about his desire for her to move to the first grade went on even after Jason Pope had sent e-mails to the first grade team advising the first grade team that they would make up the first grade team for the following school year.

While Stephenson chose to resign from the District following the retaliatory actions of Jason Pope in orchestrating Megan Herrig to move to the fifth grade team to replace Stephenson and force her to take a position as a first grade teacher, which she indicated would be a significant change, particularly due to the fact that the incoming first graders had spent much of their kindergarten year learning remotely due to COVID, the actions of Jason Pope remained retaliatory and emotionally distressing to Stephenson.

The facts and circumstances considered in the light most favorable to Stephenson support a finding that Jason Pope retaliated against Stephenson for her reports of discriminatory, harassing and hostile actions by Renayee Westfield. The motion for summary judgment of the District on Stephenson's retaliation claim should be denied as well.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, Stephenson asserts that she has met her burden to establish that there are issues of fact for consideration by a factfinder that preclude the granting of summary judgment in favor of the District and against Stephenson; and has further established sufficient "fishy" circumstances to support a determination that there are genuine issues of material fact with regard to Stephenson's claims of reverse discrimination, harassment, retaliation and hostile work environment to allow Stephenson's alleged actions to be heard by a jury.

Stephenson prays that this Court deny the motion for summary judgment of the District and further prays that this matter be allowed to proceed to a hearing before a jury.

Respectfully Submitted,

ALYSON STEPHENSON, Plaintiff,

/s/**Ms. Dawn L. Wall**

Ms. Dawn L. Wall Bar Number 6196948
Costigan & Wollrab, P.C.
308 E. Washington Street
Bloomington, Illinois 61701
(309) 828-4310 phone
dwall@cwlawoffice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2024, I electronically served a copy of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and the exhibits attached thereto to the following:

Sally J. Scott
sjs@franczek.com

Caroline K. Kane
ckk@franczek.com

Hailey M. Golds
hmg@franczek.com


   **/s/ Dawn L. Wall**


Ms. Dawn L. Wall
ARDC No. 6196948
Costigan & Wollrab, P.C.
308 E. Washington St.
Bloomington, IL 61701
(309) 828-4310
dwall@cwlawoffice.com