E-FILED
Monday, 09 March, 2026  03:01:32 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| ALYSON STEPHENSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 23-CV-2081 |
| v. ) | |
| ) | |
| CHAMPAIGN COMMUNITY ) | |
| SCHOOL DISTRICT NO. 4, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Plaintiff Alyson Stephenson filed her Complaint (#1) against Defendant

Champaign Community School District No. 4 ("Defendant" or "District") on April 5,

2023, alleging claims of race and gender discrimination, hostile work environment,

and retaliation, all in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), as amended, 42 U.S.C. § 2000e et seq.

Before the court is Defendant's Motion for Summary Judgment (#13), filed on

July 30, 2024. Plaintiff filed her Response (#14) on August 20, 2024, to which

Defendant filed a Reply (#15) on September 3, 2024. For the following reasons,

Defendant's Motion for Summary Judgment is GRANTED.

**BACKGROUND**

The following background facts are taken from Defendant's Statement of

Undisputed Material Facts, Plaintiff's Additional Material Facts in her Response, and

the exhibits attached to the parties' filings.

The court will only consider those facts properly before it. Most of the facts are recited in chronological order, and the court has endeavored to organize any facts not associated with specific dates in the most logical order.

Undisputed Material Facts

Plaintiff is a Caucasian female who was formerly employed with Defendant from August 17, 2015, to July 9, 2020. She was hired as a full-time certified teacher and at all times was assigned to work as a fifth grade teacher at Bottenfield Elementary School. She received tenure on August 19, 2019. Her supervisors during the 2019-2020 school year were Assistant Principal Renayee Westfield (African American, female) and Principal Jason Pope (Caucasian, male).

Plaintiff had a great relationship with Westfield for four of the five years that Plaintiff worked at Bottenfield. Plaintiff testified in her deposition that she and Pope were professional, that she generally got along with her other colleagues at work, and there was not anyone she did not get along with.

During the time that Westfield was the Assistant Principal under Pope, Westfield was Plaintiff's supervisor and evaluator. Westfield would conduct both formal and informal observations of Plaintiff during the school year. Plaintiff received positive performance reviews of "proficient" or "excellent," which included those completed by Westfield and Pope. Plaintiff was never disciplined.

2

Plaintiff was aware of Defendant's policies prohibiting discrimination, harassment, and retaliation, and received annual training. During her employment, Plaintiff was represented by the Champaign Federation of Teachers (the "Union") and was subject to a collective bargaining agreement, which contained a nondiscrimination provision and grievance policy.

*Incidents of Alleged Discrimination and Hostile Work Environment*

In June 2019, Plaintiff flew to Dallas, Texas, for a work conference. She brought her six-week-old infant with her. While at the airport in Champaign, Illinois, two or three Black female administrators, including Westfield, assisted Plaintiff with her bags and were kind and friendly. When they arrived at the Dallas airport, the same administrators told Plaintiff that they had coordinated their own ride to the hotel, which was 40 minutes away, and that they would see her there. Plaintiff, with her infant, had to find her own ride to the hotel. Plaintiff had paid for her mother-in-law to fly down later to take care of the infant in the hotel while Plaintiff attended the conference. Westfield knew prior to leaving the Dallas airport that Plaintiff's mother-in-law was not then at the airport. Westfield did, however, text Plaintiff within a group chat to check in with her, and Plaintiff was able to get to the hotel safely.

Plaintiff testified that other Bottenfield teachers and an instructional coach also went to the conference, but they flew out of Bloomington and arrived in Dallas before Plaintiff. Plaintiff did not know why they had different flights, and Plaintiff did not arrange the travel. The other teachers on the trip, including Andrew McDaniel and Nick Ponder, similarly found their own rides to the hotel upon

landing at the Dallas airport. Plaintiff testified as to the reason she believed this incident was discriminatory towards her: "Because I was the only white female and I clearly got left behind and not included. It would have been very easy for them to just say, 'Please come with us.'" Her reference to being "not included" was a reference solely to the ride from the airport to the hotel.

In the fall of 2019, during an internal AVID[1] meeting, Westfield said that only Ponder and McDaniel could handle difficult students. Plaintiff interpreted this as implying that she was not able to handle difficult students; however, Westfield never said that Plaintiff could not handle difficult students.

Also in the fall of 2019, Westfield told McDaniel that he was "white but not white." Plaintiff testified that Westfield made that comment in front of Plaintiff, and that this incident was one of the ways she believed was treated differently than her coworkers. When asked in her deposition why Plaintiff believed this incident was discriminatory against her, she testified: "Well, I guess it's more of a general setting in terms of I don't know why that sort of environment is allowed and why it's okay to be in that environment. It makes people feel very uncomfortable and unwelcome, as if being white is a problem." Plaintiff reported this incident to the Union.

Westfield made an "unprofessional" comment when she told Plaintiff to distance herself from her teammates and to watch with whom she associated. This statement occurred after Plaintiff, Pope, and Westfield had had discussed a student behavior issue in which students were anonymously emailing teachers, including

---

[1] Defendant explains that "AVID is a college and career readiness program that provides skills and strategies to students who need support."

Plaintiff and McDaniel. Westfield pulled Plaintiff into her office for a one-on-one discussion and stated that she believed that it was a staff member sending those emails, posing as a student, and that Plaintiff should watch whom she was associating with. Westfield told Plaintiff that Westfield thought she knew who was sending the emails, but would not tell Plaintiff who it was or how she knew. Plaintiff felt harassed by Westfield because Westfield was telling her she knew something and then telling her to watch who she associated with. Plaintiff further testified she did not know how it was discriminatory based on her race, and when asked how it was discriminatory based on her gender, Plaintiff responded: "If she was alluding to the fact that [Plaintiff] was associating with males or associating with females. Again, she was so general about the topic that I'm not sure what she was referring to[,]" although Westfield did not refer to males or females in that conversation.

In fall of 2019, Westfield said that Defendant needed more Black teachers in the context of a particular student behavior situation. Plaintiff agreed with this statement. Westfield did not state that Plaintiff did not handle the student behavior situation correctly.

In the fall of 2019, the faculty held a meeting to review the test scores of students, which reflected that the students were doing well in math and reading. All staff members at Bottenfield were present, including Pope. Westfield made a comment to the effect of: I wouldn't be surprised if some of you had just walked out of a KKK meeting, but your test scores don't reflect that, so what you do on your free time is none of my business. The statement was directed at staff as a whole and no one in particular. Plaintiff reported this incident to the Union. Pope had a coaching

conversation with Westfield following the incident. Plaintiff testified that she believed the incident was discriminatory "[b]ecause it's extremely inappropriate to say that someone, particularly a white person, is part of the KKK or make that assumption, especially in a public school building."

At a meeting on November 4, 2019, a statement was made by Westfield that "our teaching evaluation model is 'white streamed.'"[2]

On November 11, 2019, at the end of a committee meeting, Westfield said directly to Plaintiff: "I'm going to tell you one more thing. With all of this union stuff going on do with it what you want, but I suggest you start separating yourself from your teammates."

In January 2020, Pope brought a new teacher aide into the building, Smith, and introduced him to staff. Pope skipped over Plaintiff twice when making introductions. Each of the individuals that Pope introduced to Smith were Caucasian females. When Plaintiff asked Pope why he did not introduce her, Pope apologized, expressed how much he valued her as a teacher, and Plaintiff accepted that apology. Pope thereafter introduced them.

---

[2] Defendant agrees that Plaintiff made this assertion in her interrogatory responses, but argues she failed to offer any evidence supporting the assertion or allege facts to indicate the statement was discriminatory toward her. Plaintiff's evidence need not be produced in a form that would be admissible at trial, and her sworn interrogatory responses are sufficient. See *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

On February 27, 2020, during a committee meeting to discuss behavioral interventions for three students, Westfield read excerpts[3] from three articles, including an article titled "Sippin the EquiTEA." Westfield read out loud from that article, which related to a picture depicting three students who were standing on different sized boxes to try and look over a fence and discussed equality versus equity. Plaintiff testified that Westfield stood up and read the article to Plaintiff "about how that photo is an example of white supremacy. And she read the entire article word for word aloud to me, directing it towards me." Prior to this committee meeting occurring, Plaintiff had attached that same picture to an email she sent to Westfield. Westfield testified in her deposition that the article included the term white supremacy or white supremacists, but she could not recall anything further about the reference because she did not read that part out in the meeting. Westfield never stated that Plaintiff, or anyone, was a white supremacist. Plaintiff testified that several people approached her after this meeting, "saying how uncomfortable it was and inappropriate, and they apologized that that happened to me."

On March 6, 2020, Plaintiff and her colleague, Kerri Schmitt, met with Pope. Pope was aware of Westfield's KKK comment and Westfield "refusing to help in [Plaintiff's] classroom." Plaintiff testified she told Pope that it was "a very uncomfortable and hostile work environment to be in and that [they] needed to have a meeting" to find a solution "because it was not sustainable." Plaintiff told Pope that the environment was toxic and unbearable. One issue they discussed was that

---

[3] Plaintiff's Additional Material Facts are contradictory, stating at different points both that "Westfield read *excerpts* from three articles" but also that "Westfield read the *entire* article word for word aloud to [Plaintiff] . . . ." (Emphases added).

Westfield was pulling students out of Plaintiff's classroom, having lunch with them, and going on walks with them. At one point, Westfield had asked one of Plaintiff's students if she was uncomfortable as a Black student in Plaintiff's classroom. Because of Westfield's private, one-on-one meetings with students in Plaintiff's classroom, Plaintiff said that, if Westfield was going to pull students out to talk or have lunch, Plaintiff wanted another adult to be present, because of the nature of the conversations Westfield was having with those students and Plaintiff's lack of trust with the administration. Union representative Ann Ramirez attended the meeting, took notes, and Plaintiff received a copy of the notes shortly after the meeting.

On March 10, 2020, Plaintiff called the office stating that she needed assistance with a student who was cussing and yelling at another student. The school nurse was sent to assist Plaintiff. Plaintiff testified that Westfield interpreted Plaintiff's request—that another adult be present if Westfield pulled students out of her classroom—to mean that when Plaintiff called for assistance, Westfield should not go to Plaintiff's classroom and provide assistance at all.

On March 11, 2020, there was a follow-up meeting to address Plaintiff and Schmitt's concerns from the March 6th meeting and discuss a way of moving forward.[4] Westfield, Pope, and Orlando Thomas (a District executive) were present at that meeting, as well as Plaintiff, Schmitt, and two Union representatives. Pope

---

[4] Plaintiff did not dispute this fact in her Response. However, Plaintiff testified that Pope said they would *not* address Plaintiff's concerns about the work environment, which testimony is reflected in Plaintiff's Additional Material Fact No. 15. But, Plaintiff also testified that during the meeting they discussed the instances where Westfield pulled individual students from Plaintiff's classroom for private, one-on-one discussions, which testimony is reflected in her Additional Material Fact No. 16.

did most of the talking. Westfield's one-on-one discussion and Plaintiff's request for an additional adult's presence were again discussed. A Union representative took notes at the meeting and Plaintiff received a copy of the notes shortly after the meeting.

Plaintiff went to the Union representatives in the fall of 2019. Then in March of 2020, Plaintiff and a group of 20 to 25 Bottenfield teachers went to the Union representatives in support of Plaintiff and to discuss the general environment of the building. There was an internal meeting to discuss. No one from District administration was present at that meeting.

At some point, Westfield had talked to three of Plaintiff's students, and in that meeting, the students mentioned that they felt that Plaintiff was racist. Westfield testified, "Kind of in her defense they also said it about the other two fifth grade teachers. But it was her three students." As soon as the students mentioned that in the meeting, Westfield testified that she stopped the meeting, got up and went to go get Pope, and had him conduct the meeting with the students. Westfield testified that Pope informed her that "it was that meeting that made [Plaintiff] feel that I was -- I guess asking her students or speaking to her students about her being a racist when this was what the students came down to report."

In the spring of 2020, there was an opening for a third grade teacher for the 2020-2021 school year. One of the first grade teachers, Megan Herrig, interviewed for the opening but did not get the position. Pope asked Westfield to have a conversation with Herrig about moving to fifth grade. Westfield did so, and asked Herrig if she would be comfortable moving to fifth grade.

Westfield testified that Pope planned on moving Plaintiff from teaching fifth grade to first grade. Toward the end of the school year, Pope contacted Plaintiff stating that Herrig wanted to move to fifth grade, and that he thought Plaintiff would make a great first grade teacher and asked if she would move to first grade. Plaintiff indicated that she did not want to teach first grade. Pope then contacted the first grade team and informed them of the decision that they would make up the first grade team that year. Pope continued to pursue Plaintiff and wanted to set up a meeting to discuss the first grade position and Plaintiff's decision as to why she did not want to move grade levels. Plaintiff felt Pope was putting her in a position he knew she was not comfortable in and setting her up to fail. Plaintiff felt the attempt to move her was done with "ill intentions and not in [her] best interests or the students' best interests in mind." Plaintiff reported to the Union that Westfield called Herrig and asked her to consider moving to the fifth grade.

Plaintiff was never assigned to the first grade position, and on May 20, 2020, she received her tentative assignment for the 2020-2021 school year as a fifth grade teacher.

In May 2020, Plaintiff applied for a job with Little Hearts and Hands, a private school, and she accepted an offer of employment as a full-time second grade teacher on July 8, 2020. The next day, July 9, 2020, Plaintiff voluntarily resigned from her employment with Defendant. Defendant did not terminate Plaintiff's employment. Plaintiff worked at Little Hearts and Hands for one school year. Plaintiff later voluntarily left her employment and has maintained full-time employment at all times.

10

Plaintiff testified that she resigned "because of all of the incidents that happened to me and the environment that I was in and the uncertainty and the unknown and the completely unprofessional and unacceptable environment that anyone shouldn't ever have to endure."

Plaintiff never submitted a complaint to Human Resources regarding any alleged discrimination, harassment, or retaliation. When asked in her deposition if she had ever submitted such a complaint to Human Resources, she did testify that she "submitted it to Jason Pope," but she was not sure what he did with the information. Plaintiff then agreed that by saying she "submitted it to Jason Pope," she was referring to her initial meeting with Pope and Schmitt. Plaintiff never filed a grievance. In Pope's deposition, he testified that he did not recall ever initiating an investigation regarding complaints by Plaintiff or Schmitt of claims of a hostile work environment.

Plaintiff testified that she felt that Pope and Westfield subjected her to a hostile and harassing environment because "the repetitive nature of [the incidents] and the persistence in a short amount of time was very uncomfortable and terrible." She further testified that she felt Pope and Westfield retaliated against her by potentially moving her to a different grade level, and that was the only incident she believed was retaliation.

Plaintiff claims that the above instances were discriminatory based on her status as a Caucasian female teacher, and that her male counterparts, McDaniel and Ponder, who are both Caucasian males, were treated more favorably. Plaintiff asserts

11

that they were treated differently because they were more vocal and commanding of the room.

There were no Black teachers at Bottenfield during June 2019 through May 2020, thus, no Black teacher was treated more favorably than Plaintiff. Westfield stated that she was the only Black certified staff person at Bottenfield, and "conversations on race were hard to have as an administrator and as equity AP for the District."

*District Policies*

Defendant's "General Personnel - Nondiscrimination" policy provides, inter alia:

> It shall be the policy of the Board of Education of this District to prohibit discrimination against any employee on account of race, color, creed, religion, national origin, ancestry, sex, age, marital status, physical or mental handicap unrelated to ability, or unfavorable discharge from the military. . . .

> Any employee who believes he/she has been discriminated against by any supervisor, co-worker, or non-employee should immediately notify his/her supervisor, or if the supervisor is alleged to have discriminated, the next immediate supervisor may be notified. . . .

Defendant's "General Personnel - Workplace Harassment Prohibited" policy provides, inter alia:

> Whom to Contact with a Report or Complaint

> An employee should report claims of harassment to any of the following: his/her immediate supervisor, the Building Principal, an administrator, or the Executive Director of Human Resources . . .

12

The Parties' Disputes of Fact

The parties dispute some facts pertaining to the incidents described above. "Not all factual disputes will preclude the entry of summary judgment, only those that 'could affect the outcome of the suit under governing law.'" *TWD, LLC v. Grunt Style LLC*, 598 F. Supp. 3d 676, 683 (N.D. Ill. 2022) (quoting *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001)). Even if there is a genuine issue of material fact on one element of a claim, summary judgment is still appropriate if a plaintiff cannot provide evidence to support *all* necessary elements of the claim. *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007). For reasons to follow in this Order, even construing all disputes and objections in Plaintiff's favor, summary judgment is still appropriate.

First, some of the parties' undisputed material facts surrounding the March meetings and student incident are unclear and create an inconsistent timeline. Plaintiff testified that she had discussed Westfield's one-on-one meetings with students and her request for an additional adult's presence during the March 11th meeting with Pope and Thomas. However, it is undisputed that the student incident where the nurse was sent to assist Plaintiff (precipitated by Westfield's misinterpretation of the request) occurred the day prior, March 10th. Clearly, Westfield could not have declined to assist Plaintiff on March 10th pursuant to a request that wasn't made until the next day.

After parsing the evidence, it appears that Westfield's one-on-ones and Plaintiff's request for an additional adult were discussed during *both* the March 6th and March 11th meetings. Thus, the request was made March 6th, Westfield

misinterpreted that request and the school nurse was sent to help Plaintiff on March 10th, and the request was again discussed on March 11th.[5]

Still concerning the March 6th meeting, Plaintiff testified that Pope:

[W]as aware of all the things that had happened previously in terms of everything from the airport incident to the KKK comment made at the staff meeting to the white supremacy article being read aloud to me to refusing to help in my classroom. So he was aware of all of those things, and it was understood why.

Defendant disputes that Pope was aware of the airport incident and white supremacy article because it is speculative and Plaintiff lacks personal knowledge to offer such testimony.

Defendant does not dispute, however, that Pope knew about Westfield sending the nurse to respond to Plaintiff's request for assistance (but argues Plaintiff's citation does not support the characterization as a refusal to respond). One problem—the school nurse incident happened *after* the initial meeting with Pope. Obviously, Pope could not have known about an incident that hadn't happened yet. Two options seem possible here: either Pope knew about the school nurse incident going into the March 11th meeting (rather than the March 6th meeting), or, the assertion that Pope knew about Westfield "refusing to help" in Plaintiff's classroom does not refer to the school nurse incident (as Defendant's response implies). In any event, all the disputes pertaining to the March incidents are immaterial.

---

[5] The court notes that it did not weigh the evidence or make any credibility findings in clarifying this timeline. Rather, it reviewed the evidence, construed it in the light most favorable to Plaintiff, and drew all justifiable inferences in her favor.

Next, Plaintiff contends that when Westfield called Herrig to discuss moving from first grade to fifth grade, Westfield asked Herrig "to move to fifth grade, in [Plaintiff's] spot, as a favor to" Westfield. Defendant disputes that assertion (that Westfield asked "as a favor") as "inadmissible and hearsay."

Finally, Plaintiff testified that she felt Pope and Westfield were retaliating against her because they knew she had gone to the Union, retained an attorney, requested multiple meetings with the administration, and because she had the "support of lots of the staff in the building." Defendant disputes these assertions, arguing the record does not support that Plaintiff went to the administration several times or that the administration knew Plaintiff went to the Union. It also disputes that Plaintiff had staff support, arguing that assertion is speculative and Plaintiff lacks personal knowledge to offer that testimony.

**ANALYSIS**

Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court is tasked with deciding, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is appropriate only where the evidence is such that no reasonable jury could return a verdict in the nonmovant's favor. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

15

In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). In other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Likewise, the court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F.Supp.2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (cleaned up).

To survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 322-23). Summary judgment is neither a substitute for a trial on the merits, nor a vehicle for resolving factual disputes. *Waldridge,* 24 F.3d at 918. "But, if it is clear that a plaintiff will be unable to satisfy the legal requirements

16

necessary to establish his or her case, summary judgment is not only appropriate, but mandated." *Vaughn v. Radio One of Indiana, L.P.*, 151 F. Supp. 3d 877, 885 (S.D. Ind. 2015) (citing *Celotex Corp.*, 477 U.S. at 322).

The Parties' Arguments

Defendant argues for summary judgment in its favor on all claims. Beginning with the race discrimination claim, it argues Plaintiff cannot show "background circumstances" establishing that Defendant had reason or inclination to discriminate invidiously against white employees, that Plaintiff suffered an adverse employment action, or that similarly situated teachers were treated more favorably based on race.[6] Defendant likewise argues Plaintiff's gender discrimination claim fails because she was not subject to an adverse employment action and there is no evidence any comparators were treated more favorably. As to the hostile work environment claim, Defendant argues many of the complained-of incidents are unrelated to race or gender, the incidents are not severe enough to create a hostile work environment, they did not unreasonably interfere with Plaintiff's work, and there is no basis for employer liability. Finally, Defendant argues Plaintiff cannot make a sufficient

---

[6] After Defendant's Motion was fully briefed, the Supreme Court issued its decision in *Ames v. Ohio Dep't of Youth Servs.* which modified the framework traditionally applied in this Circuit in cases involving reverse discrimination. 605 U.S. 303, 305-06 (2025). Before *Ames*, in this Circuit, a "[w]hite plaintiff[ ] had to show background circumstances suggesting that the defendant-employer had 'reason or inclination to discriminate invidiously' against white people." *Paterakos v. City of Chicago*, 147 F.4th 787, 796 n.1 (7th Cir. 2025) (quoting *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022)). The *Ames* Court held that the "background circumstances" requirement was "inconsistent with Title VII's language and the Court's case law construing that statute." *Id.* "As a result, white plaintiffs no longer need to show background circumstances to make out a prima facie case of race discrimination under *McDonnell Douglas*." *Id.*

showing as to any of the elements for her retaliation claim—that she engaged in a protected activity, suffered a materially adverse action, or a causal relationship between the two. Common among Defendant's arguments is that Plaintiff did not suffer an adverse employment action (or an adverse action).

Plaintiff has chosen to not address many of these arguments. She begins by identifying certain incidents, arguing those incidents support a finding of "background circumstances" and that Defendant discriminated against her because she is Caucasian. She then argues the same instances establish that she was subject to a hostile work environment—which, she argues, was the adverse employment action she suffered. Finally, she contends the evidence establishes that she was retaliated against after reporting Westfield's conduct.

With the arguments framed as such, the court begins with whether Plaintiff experienced a hostile work environment.

<u>Hostile Work Environment</u>

Plaintiff identifies eight specific incidents in support of her hostile work environment claim[7]:

> (1) Westfield "reading out an article referencing 'white supremacy' directly to [Plaintiff] when [Plaintiff] was in a committee meeting addressing student behavior issues with other colleagues";

> (2) Westfield stating at an all-staff meeting that Plaintiff attended that "the District's teacher evaluation method was 'white streamed'";

> (3) Westfield stating at an all-staff meeting that "the white teachers in attendance, including [Plaintiff], could have just walked out of a KKK

---

[7] These are the incidents, Plaintiff argues, that both establish "background circumstances" for her reverse discrimination claim, and support a finding that she raised a genuine issue of material fact as to whether she was subjected to a hostile work environment.

meeting; but it was fine with her because what the teachers did on their own time was none of her business";

(4) Westfield stating at the AVID meeting that Plaintiff attended that "only Nick Ponder and Andrew McDaniel, male Caucasian teachers, can handle difficult students";

(5) Westfield stating McDaniel was "white but not white";

(6) Westfield telling Plaintiff to distance herself from her teammates and to watch with whom she associated;

(7) Westfield and two or three other Black female administrators leaving Plaintiff to make her own transportation arrangements to get from the Dallas airport to the hotel for a conference, even though Westfield knew Plaintiff was with her six-week-old infant and the only Bottenfield staff member left at the airport;

(8) Westfield having lunch with Plaintiff's students, going on walks with them, and once asking one of Plaintiff's students if the student was uncomfortable being a Black student in Plaintiff's classroom.

"Employers violate Title VII when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Jones v. Das*, 164 F.4th 1024, 1032 (7th Cir. 2026) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

To prove a claim for hostile work environment based on race or gender, Plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on her race or gender; (3) the harassment was so severe or pervasive so as to alter the conditions of her work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. See *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1115-16 (7th Cir. 2022); *Jones*, 164 F.4th at 1032. Courts "consider the totality of the circumstances when

19

determining whether conduct is severe or pervasive." *Jones*, 164 F.4th at 1032

(quoting *Scaife*, 49 F.4th at 1116). "In making that assessment," courts consider:

> (1) the frequency of the discriminatory conduct; (2) how offensive a
> reasonable person would deem it to be; (3) whether it is physically
> threatening or humiliating conduct as opposed to verbal abuse; (4)
> whether it unreasonably interferes with an employee's work
> performance; and (5) whether it is directed at the victim.

*Id.* at 1032-33 (quoting *Scaife*, 49 F.4th at 1116). But, the "standards for judging

hostility are sufficiently demanding to ensure that Title VII does not become a

general civility code." *Id.* at 1033 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775,

788 (1998)).

Defendant argues that: (1) many of the incidents are unrelated to race or

gender, and ones that are were either not directed toward Plaintiff or made in the

context of student issues; (2) even taken together, the incidents represent off-hand

comments that are not overtly harassing or discriminatory, although "perhaps

unprofessional," and are not severe enough to create a hostile work environment; (3)

the conduct may have upset Plaintiff, but it did not unreasonably interfere with her

work; and (4) there is no basis for employer liability because Plaintiff's complaints

were insufficient, but regardless, Defendant took prompt remedial action by having

meetings to address Plaintiff's concerns.

Plaintiff argues that the incidents described raise a genuine issue of material

fact as to whether she was subjected to a hostile work environment. She argues that

the repetitive nature and persistence of Westfield's conduct created a hostile work

environment, that Westfield's comments and "innuendos" were specifically targeted

toward Plaintiff, and Westfield's comments made "[Plaintiff] feel it was a problem

that she was white." She also argues that Pope "chose to ignore [Plaintiff's] requests for assistance in resolving what she repeatedly reported to [Pope] was a hostile work environment as a white female because of" Westfield's conduct.

Construing all facts in the light most favorable to Plaintiff, it is clear that Plaintiff did not suffer a hostile work environment.

First, only one of the incidents even remotely implicates gender—Westfield's statement that only Ponder and McDaniel (two male, Caucasian teachers) can handle difficult students. "Though the alleged conduct need not 'consist of pressure for sex, intimate touching, or a barrage of deeply offensive sexual comments,' the 'demeaning, ostracizing, or even terrorizing' conduct must still be related to gender." *Scaife*, 49 F.4th at 1117. Assuming this incident does implicate gender by virtue of Westfield only naming two male teachers as ones who can handle difficult students, it is certainly not demeaning, ostracizing, or terrorizing. See *id.* And, Plaintiff herself "asserts that they were treated differently because they were more vocal and commanding of the room"—not because they were male. Westfield never explicitly said that Plaintiff could not handle difficult students. No reasonable jury could find that Plaintiff suffered a gender-based hostile work environment from this incident.

Further, the court agrees that a couple of the instances are unrelated to race. The same comment by Westfield on handling difficult students, telling Plaintiff to distance herself from teammates and watch who she associated with, and generally having lunch and taking walks with Plaintiff's students are simply unrelated to race.

21

That aside, Westfield's conduct is not sufficiently severe or pervasive to constitute a hostile work environment. Her conduct was infrequent, with Plaintiff specifying just eight incidents (some unrelated to race, most unrelated to gender) over a period of eleven months. The incidents occurred in Plaintiff's presence, but many were not directed at her. And, while at times inconsiderate or unprofessional, Westfield's comments and actions were not threatening or humiliating. "[S]upervisors may be short tempered, hostile, unfairly critical, and disrespectful without creating a workplace permeated with discriminatory intimidation, ridicule, and insult." *Jones*, 164 F.4th at 1034 (cleaned up). Westfield's conduct does not even go that far. Most of the incidents Plaintiff identifies can be categorized as somewhere between neutral to offensive, at worst.

Take the February 27th committee meeting. Westfield read from three articles during the meeting, including one that related to a picture — the one Plaintiff had previously emailed to Westfield — depicting equality versus equity and indicating that the picture was an example of white supremacy. The article itself referenced white supremacy, but Westfield never stated that Plaintiff, or anyone else, was a white supremacist. Westfield read the article directly to Plaintiff, but there is no evidence or suggestion that Westfield made any further comment connecting the sentiments of the article to Plaintiff or Plaintiff's email. And it is a leap too far to say that reading an article directly to Plaintiff, that at some point contained a reference to white supremacy, was Westfield insinuating that Plaintiff was a white supremacist. Viewing the facts in the light most favorable to Plaintiff, drawing all reasonable inferences in her favor, and assuming Westfield read the entire article, this incident

22

is nowhere near severe enough to be actionable. See *Alexander v. BCI Acrylic, Inc.*, 2025 WL 36183, at *7 (N.D. Ill. Jan. 6, 2025) (finding, under totality of the circumstances, single incident of coworker's use of racial slur was insufficient for hostile work environment claim); see also *Cole v. Bd. of Trs. of N. Illinois Univ.*, 838 F.3d 888, 897 (7th Cir. 2016) (noting that single instance of sufficiently severe conduct is enough for hostile work environment claim; later suggesting one instance of noose on display in the workplace might, depending on the facts, be sufficiently severe for hostile work environment claim).

Similarly, Westfield's comment regarding teachers and a KKK meeting was unprofessional and offensive, but it was not severe harassment. Plaintiff testified in her deposition that Westfield said something to the effect of: "I wouldn't be surprised if some of you had just walked out of a KKK meeting, but your test scores don't reflect that. So what you do on [sic] your free time is none of my business." Plaintiff felt it was "extremely inappropriate to say that someone, particularly a white person, is part of the KKK or make that assumption, especially in a public school building." However, this comment was not directed toward Plaintiff and was said at an all-staff meeting with other white teachers in attendance. Nor was it threatening, humiliating, or abusive.

The court notes that Plaintiff did not specifically raise some of the other incidents described in the facts, including Westfield not assisting Plaintiff with a student incident, Westfield stating Defendant needed more Black teachers, Pope failing to introduce Plaintiff to a new teacher aide, and the discussions and actions surrounding Plaintiff switching grades. Those events are still considered under the

23

totality of the circumstances. The outcome is the same, however, as those events are likewise not sufficiently severe, by themselves or in combination with the other incidents. In the end, under the totality of the circumstances, the incidents Plaintiff describes are not sufficiently severe so as to constitute a hostile work environment, by themselves or altogether.

Additionally, there is no evidence whatsoever that any of these incidents unreasonably interfered with Plaintiff's work as a fifth grade teacher. Nor does Plaintiff respond to this argument when raised by Defendant, so any argument she could have made is waived. See *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Plaintiff may have felt upset and uncomfortable by these incidents, but there is simply no indication that any of them interfered with Plaintiff teaching her students or interacting with any other faculty or staff, besides Westfield. Aside from Westfield and Pope, Plaintiff generally got along with her colleagues and there was nobody she did not get along with. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (cleaned up). No reasonable jury could find that Westfield's offhand comments, actions, or any of the incidents changed the terms and conditions of Plaintiff's employment.

Title VII is not a general civility code. *Jones*, 164 F.4th at 1033. While some of the described incidents were inconsiderate or inappropriate, Plaintiff has failed to show that they were, individually or cumulatively, pervasive or severe enough for a jury to find she experienced a hostile work environment. Absent severe or pervasive

harassment, she cannot prevail on her hostile work environment claim.[8]

Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to

Plaintiff's hostile work environment claim.

<u>Race Discrimination</u>

At summary judgment, Plaintiff's race discrimination claim requires her to

produce evidence that would let a reasonable factfinder conclude that her race

caused her discharge or other adverse employment action. See *Paterakos v. City of*

*Chicago*, 147 F.4th 787, 795 (7th Cir. 2025); *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800,

809 (7th Cir. 2025). As indicated, Defendant argued, inter alia, that Plaintiff did not

suffer an adverse employment action, and Plaintiff responded that the hostile work

environment itself was the adverse employment action she suffered from. Plaintiff

made no other arguments pertaining to an adverse employment action, and as such,

has waived those arguments. See *Bonte*, 624 F.3d at 466. The court has already

determined that Plaintiff did not experience a hostile work environment and Plaintiff

has not put forth any other argument regarding an adverse employment action;

accordingly, summary judgment is appropriate on Plaintiff's race discrimination

claim.

Waiver aside, Plaintiff has not otherwise presented any evidence that she

suffered an adverse employment action.

"An adverse employment action is some quantitative or qualitative change in

the terms or conditions of the plaintiff's employment that is more than a mere

subjective preference." *Paterakos*, 147 F.4th at 796 (cleaned up). The change must be a

---

[8] The court need not address whether there is a basis for Defendant's liability.

"significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis*, 496 F.3d at 653 (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)). "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (citing *Lewis*, 496 F.3d at 653).

Evaluating all of Plaintiff's evidence as a whole, see *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016), the record is devoid of anything that comes close to constituting an adverse employment action. Plaintiff presented no evidence that she was passed over for a promotion, reassigned with significantly different responsibilities, or that her compensation and benefits changed. See *Boss*, 816 F.3d at 917. Plaintiff was not terminated—she applied for a job with Little Hearts and Hands in May 2020 and accepted a job as a second grade teacher on July 8, 2020. She resigned from Bottenfield the next day.

Plaintiff did testify that she resigned "because of all the incidents that happened to me and the environment that I was in and the uncertainty and the unknown and the completely unprofessional and unacceptable environment that anyone shouldn't ever have to endure." She then argues that she "chose to resign . . . following the retaliatory actions of Jason Pope in orchestrating Megan Herrig to move to the fifth grade team to replace [Plaintiff] and force her to take a position as a first grade teacher[.]"

26

Be that as it may, her resignation is still not an adverse employment action. Plaintiff's reasons for resigning hint at an argument she was constructively discharged, which, if shown, would qualify as an adverse employment action. See *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1043 (7th Cir. 2023); *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). But Plaintiff has not made the argument, and the court will not make it for her. See *United States v. Amerson*, 185 F.3d 676, 689 (7th Cir. 1999) ("[I]t is not the role of this court to research and construct the legal arguments open to parties[.]" (quoting *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996))). Even if she did, it would not go far, since a constructive discharge claim requires her to "show working conditions even more egregious than that required for a hostile work environment claim" and that her work environment had become so intolerable that she was forced to resign. See *Chapin*, 621 F.3d at 679. Since Plaintiff's working conditions do not rise to the level of a hostile work environment, they cannot be the basis for a constructive discharge claim. See *id.*

Plaintiff references Pope "orchestrating" her replacement and "forc[ing] her to take a position as a first grade teacher," but the fact remains that Plaintiff was never assigned to the first grade position, and on May 20, 2020, before she resigned, she had received her tentative assignment for the next school year in her same position—fifth grade teacher.

Moreover, Westfield was Plaintiff's supervisor and evaluator during the time she was Assistant Principal under Pope, and she conducted both formal and informal observations of Plaintiff during the school year. Plaintiff was never

27

disciplined and she received positive performance reviews of "proficient" or "excellent," including those completed by Westfield and Pope.

Plaintiff has failed to adduce evidence of any materially adverse employment action. Having failed to show that a reasonable jury could conclude Plaintiff's race caused her discharge or other adverse employment action, summary judgment is appropriate on Plaintiff's race discrimination claim. Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's race discrimination claim.

<u>Gender Discrimination</u>

Defendant argues that Plaintiff's gender discrimination claim similarly fails because she was not subject to an adverse employment action, nor can she establish that McDaniel or Ponder were treated more favorably than her. Plaintiff's Response does not make any specific argument regarding her gender discrimination claim. Defendant's Reply notes this failure to respond and argues Plaintiff has abandoned this claim and waived any argument in opposition.

The court agrees. By failing to respond to Defendant's challenges to her gender discrimination claim, the court finds that Plaintiff has waived her arguments and abandoned this claim. See *Bonte*, 624 F.3d at 466; *Ericson v. Stolfe*, 2018 WL 4355202, at *8 (N.D. Ill. Sept. 12, 2018) (collecting cases). Waiver aside, the claim would still fail since Plaintiff failed to show she suffered an adverse employment action, for the reasons stated above. See *Mitchell*, 143 F.4th at 809. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's gender discrimination claim.

Retaliation

The court now turns to Plaintiff's final claim: retaliation. To survive summary judgment, Plaintiff must show that she (1) engaged in a statutorily protected activity, (2) suffered a materially adverse action by her employer, and (3) there is a causal link between the two. See *Scaife*, 49 F.4th at 1118.

Defendant argues Plaintiff cannot establish any of these elements. It argues Plaintiff's complaints to Pope and the Union were not a protected activity because she did not indicate she was being targeted based on her race or gender, Pope approaching her about her interest in teaching first grade is not a materially adverse action, and there is no evidence of causation.

Plaintiff responds that she did engage in a protected activity by reporting Westfield's discriminatory actions directly to Pope in the March 6th meeting with Pope and Schmit. She then argues that "[i]n close proximity" to her protected activity, Pope asked Westfield to ask Herrig to move from first grade and take Plaintiff's position—something Plaintiff did not want—and the only reason Plaintiff was not moved was because Herrig declined Westfield's request. Plaintiff goes on, stating that Pope asked Plaintiff why she did not want to move grades and his communications continued, despite Herrig's unwillingness to move and even after Pope "had sent e-mails to the first grade team advising the first grade team that they would make up the first grade team for the following school year." She concludes that while she "chose to resign from the District following the retaliatory actions of Jason Pope in orchestrating Megan Herrig to move to the fifth grade team to replace

29

[Plaintiff] and force her to take a position as a first grade teacher . . . the actions of Jason Pope remained retaliatory and emotionally distressing to [Plaintiff]."

The range of conduct prohibited under Title VII's anti-retaliation provision is broader than what is prohibited under its anti-discrimination provision. *Phelan v. Cook Cnty.*, 463 F.3d 773, 787 (7th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66-67 (2006)), overruled on other grounds by *Ortiz*, 834 F.3d at 760. Thus, Plaintiff's failure to show a materially adverse employment action above does not itself doom the retaliation claim.

For retaliation claims, an adverse action is not limited to those that alter the terms and conditions of a plaintiff's employment. See *White*, 548 U.S. at 62. Rather, the question is whether the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918 (citing *White*, 548 U.S. at 68). That said, Title VII does not protect an individual from *all* retaliation, "but from retaliation that produces an injury or harm." *White*, 548 U.S. at 67. It "does not protect against petty slights, minor annoyances, and bad manners." *Boss*, 816 F.3d at 918.

The only incident Plaintiff argues was retaliatory was the potential grade level move. No reasonable jury could determine that Pope intending to move Plaintiff grades, asking if she wanted to move, asking her why she did not, and Westfield talking to Herrig would dissuade a reasonable worker from making a charge of discrimination. See *id.* Again, Plaintiff was *not* forced to move to first grade, nor was she ever assigned to first grade. Her tentative assignment, before her voluntary resignation, was for her same position as a fifth grade teacher. There is no

30

evidence that Pope's communications with Plaintiff about the issue were hostile, pushy, disrespectful, threatening, or anything other than professional. To the contrary, Pope appeared complimentary—he told Plaintiff he thought she would make a great first grade teacher.

Plaintiff also fails to establish the causal link between making her complaints and Pope's or Westfield's actions. To demonstrate the required causal link between the protected activity and the adverse action, a plaintiff must show that a defendant would not have taken the adverse action but for the protected activity. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Plaintiffs may use circumstantial evidence to establish this link, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Id.*

Plaintiff's only suggestion of circumstantial evidence is a passing reference that Pope initiated conversations about Herrig and Plaintiff moving grades "[i]n close proximity" to Plaintiff's protected activity. This is presumably a suspicious timing argument. But suspicious timing will "rarely be sufficient in and of itself to create a triable issue." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)). "The reason is obvious: suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Id.* (cleaned up) (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). And for an inference of causation to be drawn solely from suspicious timing, Seventh Circuit precedent typically allows

31

for "no more than a few days to elapse between the protected activity and the adverse action." *Id.* Plaintiff's situation—a two- to three-month gap—does not suffice.

Finally, the court notes that the parties dispute the facts surrounding Plaintiff's protected activity, e.g., what exactly Plaintiff told Pope in the March 6th meeting. But without evidence that she suffered an adverse action, Plaintiff's retaliation claim necessarily fails, so those disputes of fact do not preclude summary judgment. See *Lewis*, 496 F.3d at 652. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claim.

Ultimately, Plaintiff predominantly relied on identifying factual disputes to save herself from summary judgment. However, not every factual dispute provides such an escape. See *id*. This is not a case in which the record is "replete with credibility questions and competing versions of the facts," such that the question of whether Plaintiff suffered an adverse employment action (or an adverse action) should be sorted out by the trier of fact. See *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 237 (7th Cir. 2014) (quoting *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006)) (affirming summary judgment for defendant on plaintiff's Title VII discrimination and retaliation claims, despite factual disputes, because plaintiff did not suffer an adverse employment action), overruled on other grounds by *Ortiz*, 834 F.3d at 760.

Because Plaintiff did not make a sufficient showing as to all the required elements for her claims, summary judgment is proper. See *id.* at 237-38; *Lewis*, 496 F.3d at 652. Defendant's Motion for Summary Judgment is therefore GRANTED in full.

IT IS THEREFORE ORDERED THAT:

(1) Defendant Champaign Community School District No. 4's Motion for Summary Judgment (#13) is GRANTED.

(2) Judgment is to enter in favor of Defendant Champaign Community School District No. 4 and against Plaintiff Alyson Stephenson.

(3) This case is terminated.

ENTERED this 9th day of March 2026.

s/ *Colin S. Bruce*
COLIN S. BRUCE
U.S. DISTRICT JUDGE